02-10-291-CV









 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

NO. 02-10-00291-CV

 

 


 
 
 Curtis Chesser, Individually, and Through His
 Spouse and Power of Attorney, Ava Chesser
 
 
  
 
 
 APPELLANT
 AND APPELLEE
 
 
 
 
  
 V.
  
 
 
 
 
 LifeCare Management Services, L.L.C. and LifeCare
 Hospitals of North Texas, L.P. d/b/a LifeCare Hospital of Fort Worth
 
 
  
 
 
 APPELLEES
 AND APPELLANTS 
 
 


 

 

----------

 

FROM THE 236th
District Court OF Tarrant COUNTY

----------

 

OPINION

----------

 

I.  Introduction

A
jury returned a verdict for Appellant Curtis Chesser, individually, and through
his spouse and power of attorney, Ava Chesser, in his health care liability
suit against Appellees LifeCare Management Services, L.L.C. (LMS) and LifeCare
Hospitals of North Texas, L.P. d/b/a LifeCare Hospital of Fort Worth (Hospital). 
After applying the statutory caps to the noneconomic damages awarded by the
jury, the trial court signed a judgment on the jury’s verdict.  Chesser perfected
an appeal, raising one issue:  the trial court erred by submitting the negligence
of three settling doctors to the jury because no evidence of their negligence
exists.  Appellees perfected a cross appeal, raising eight issues: two charge
error issues, two sufficiency of the evidence issues, and four issues alleging
computation errors in the judgment.[1]  For the reasons set
forth below, we will sustain Chesser’s sole issue and will modify the trial
court’s judgment to delete the percentage-of-responsibility settlement credit given
to Appellees; we will apply a dollar-for-dollar settlement credit.  We will sustain
Appellees’ fourth issue challenging the legal sufficiency of the evidence to
support the jury’s joint enterprise finding and will accordingly modify the
trial court’s judgment to delete the imposition of joint and several liability
on LMS.  We will also sustain subpart B of Appellees’ fifth issue challenging
LMS’s joint and several liability with Hospital for Hospital’s $250,000
noneconomic damages civil liability and challenging Hospital’s joint and
several liability with LMS for LMS’s $250,000 noneconomic damages civil
liability.  We will modify the judgment to delete LMS’s joint and several
liability for Hospital’s $250,000 noneconomic damages civil liability and to
delete Hospital’s joint and several liability for LMS’s $250,000 noneconomic
damages civil liability and we will render judgment that Hospital and LMS are
each severally liable for $250,000 in noneconomic damages plus prejudgment and postjudgment
interest on that amount.  With these modifications, we will affirm the trial
court’s judgment.

II.  Factual Overview

Fort
Worth Police Officer Curtis Chesser suffered a mild stroke that affected his
ability to swallow.  He was without pain and was without cognitive impairment.  After
spending a few days in Huguley Hospital and Granbury Hospital, he was
transferred to Hospital for rehabilitation and therapy.  Hospital is a long-term
acute care hospital; it does not have an operating room, recovery room, or
anesthesia services.  At Hospital, Chesser was treated by physicians Dr. Ade
Adedokun, Dr. Edward Ferree, and Dr. Burke DeLange.  A few days after Chesser’s
admission to Hospital, in an examination room at Hospital, Dr. DeLange; Carol Smith,
R.N.; and Cindy Barnett, R.N. surgically inserted a percutaneous endoscopic
gastrostomy (PEG) tube through Chesser’s abdominal wall into his stomach.  An
hour after insertion of the PEG tube, at 10:20 a.m., Chesser’s medical chart
indicated that he reported pain in his abdomen of 10 on a scale of 1–10.  

The
bolster or bumper placed around the PEG tube to keep it from moving was too
tight, resulting in severe pain to Chesser and prolonged ischemia of the
gastric tissue under the tube, which led to necrosis with erosion of the PEG tube
through the stomach wall as well as erosion of and hemorrhage of the superior
epigastric artery.  As Chesser’s condition deteriorated over the next four days,
his complaints, signs, symptoms, and their cause were not assessed or
investigated by Hospital nurses or reported to the doctors.  Realizing that
something was seriously wrong, Chesser requested a transfer to a full-service
hospital.  After Chesser’s wife observed Chesser excrete a large amount of
bright red blood through his rectum, and after Chesser’s blood pressure became
dangerously low, Chesser was transferred to Harris Hospital.  Chesser had spent
eight days at Hospital.

At
Harris Hospital, an endoscopy was performed.  The gastroenterologist performing
the procedure discovered a large ulcer on Chesser’s stomach lining, significant
amounts of blood in Chesser’s stomach, and active bleeding from the epigastric
artery.  During the endoscopy, Chesser “coded” and was resuscitated; Chesser had
suffered a cardiopulmonary arrest, cardiac injury, and cerebral injury and had
sustained permanent cognitive deficits.  Chesser remained in Harris Hospital
for several months; he then received outpatient brain injury transitional
services through May 2005 and continues to require a variety of health care
treatments and services.

III.  Standards
of Review

          We
utilize the following standards of review in our analysis of the various issues
presented and in our analysis of the effect that the sustaining of various
issues has upon the trial court’s judgment.

A.  Legal Sufficiency
of the Evidence

 

We
may sustain a legal sufficiency challenge only when (1) the record discloses a
complete absence of evidence of a vital fact; (2) the court is barred by rules
of law or of evidence from giving weight to the only evidence offered to prove
a vital fact; (3) the evidence offered to prove a vital fact is no more than a
mere scintilla; or (4) the evidence establishes conclusively the opposite of a
vital fact.  Uniroyal Goodrich Tire Co. v. Martinez, 977 S.W.2d 328, 334
(Tex. 1998), cert. denied, 526 U.S. 1040 (1999); Robert W. Calvert, “No
Evidence” and “Insufficient Evidence” Points of Error, 38 Tex. L. Rev. 361,
362–63 (1960).  In determining whether there is legally sufficient evidence to
support the finding under review, we must consider evidence favorable to the
finding if a reasonable factfinder could and disregard evidence contrary to the
finding unless a reasonable factfinder could not.  Cent. Ready Mix Concrete
Co. v. Islas, 228 S.W.3d 649, 651 (Tex. 2007); City of Keller v. Wilson,
168 S.W.3d 802, 807, 827 (Tex. 2005).

B. 
Factual Sufficiency of the Evidence

When
reviewing an assertion that the evidence is factually insufficient to support a
finding, we set aside the finding only if, after considering and weighing all
of the evidence in the record pertinent to that finding, we determine that the credible
evidence supporting the finding is so weak, or so contrary to the overwhelming
weight of all the evidence, that the answer should be set aside and a new trial
ordered.  Pool v. Ford Motor Co., 715 S.W.2d 629, 635 (Tex. 1986) (op.
on reh’g); Garza v. Alviar, 395 S.W.2d 821, 823 (Tex. 1965).

C.  Submission
of Jury Questions, Definitions, and Instructions

A
trial court has wide discretion in submitting instructions and jury questions. 
Howell Crude Oil Co. v. Donna Ref. Partners, Ltd., 928 S.W.2d 100, 110
(Tex. App.––Houston [14th Dist.] 1996, writ denied).  A trial court must submit
only “such instructions and definitions as shall be proper to enable the jury
to render a verdict.”  Tex. R. Civ. P. 277.  A proper jury instruction is one
that assists the jury and is legally correct.  Town of Flower Mound v.
Teague, 111 S.W.3d 742, 759 (Tex. App.––Fort Worth 2003, pet. denied).  We
review the trial court’s legally correct definitions, instructions, and
questions for an abuse of discretion.  St. Joseph Hosp. v. Wolff, 94
S.W.3d 513, 525 (Tex. 2003); Tex. Workers’ Comp. Ins. Fund v. Mandlbauer,
34 S.W.3d 909, 912 (Tex. 2000); Hyundai Motor Co. v. Rodriguez, 995
S.W.2d 661, 664 (Tex. 1999).

When
an appellant challenges the legal sufficiency of the evidence to support the
submission of a question to the jury, we review de novo the sufficiency of the
evidence applying the legal sufficiency standard of review.  See, e.g.,
T.O. Stanley Boot Co. v. Bank of El Paso, 847 S.W.2d 218, 220 (Tex. 1992)
(recognizing that objection to submission of question as based on no-evidence
preserves no-evidence challenge for appeal); Cont’l Cas. Co. v. Street,
379 S.W.2d 648, 658 (Tex. 1964).  

D.  Rules of Statutory
Construction

 

Issues
of statutory construction present questions of law that we review de novo applying
well-established rules of construction.  First Am. Title Ins. Co. v. Combs,
258 S.W.3d 627, 631 (Tex. 2008), cert. denied, 129 S. Ct. 2157 (2009). 
Our primary objective in statutory construction is to give effect to the
legislature’s intent.  State v. Shumake, 199 S.W.3d 279, 284 (Tex. 2006). 
To achieve this, “we look first and foremost to the words of the statute.”  Lexington
Ins. Co. v. Strayhorn, 209 S.W.3d 83, 85 (Tex. 2006).  We construe the
statute’s words according to their plain and common meaning, unless a contrary
intention is apparent from the context or unless such a construction leads to
absurd results.  City of Rockwall v. Hughes, 246 S.W.3d 621, 625–26
(Tex. 2008); see also Tex. Gov’t Code Ann. § 311.011(a) (West 2005) (“Words
and phrases shall be read in context and construed according to the rules of
grammar and common usage.”).  We also use definitions prescribed by the
legislature and any technical or particular meaning the words have acquired.  See
Tex. Gov’t Code Ann. § 311.011(b).

          Further,
we must read the statute as a whole and not just isolated portions.  Tex.
Dep’t of Transp. v. City of Sunset Valley, 146 S.W.3d 637, 642 (Tex. 2004);
Nauslar v. Coors Brewing Co., 170 S.W.3d 242, 253 (Tex. App.––Dallas
2005, no pet.)  (“We determine legislative intent from the entire act and not
just its isolated portions.”).  It is a well-settled rule of statutory
construction that every word of a statute must be presumed to have been used
for a purpose.  Gray v. Nash, 259 S.W.3d 286, 291 (Tex. App.––Fort Worth
2008, pet. denied).  Likewise, every word excluded from a statute must also be
presumed to have been excluded for a purpose.  Id.  We are required to
reconcile and harmonize apparently conflicting statutory provisions, if it is
reasonably possible, so that every enactment may be given effect.  Barfield
v. City of La Porte, 849 S.W.2d 842, 845 (Tex. App.––Texarkana 1993), aff’d,
898 S.W.2d 288 (Tex. 1995).  We also consider the objective the law seeks to
obtain and the consequences of a particular construction.  Tex. Gov’t Code Ann.
§ 311.023(1), (5) (West 2005).  In enacting a statute, it is presumed that a
just and reasonable result is intended.  Id. § 311.021(3) (West 2005).

When
a general statutory provision conflicts with a special statutory provision,
both provisions shall be construed, if possible, to give effect to both; but,
if the conflict is irreconcilable, the special provision prevails absent certain
exceptions.  Id. § 311.026 (West 2005).  Also when applying rules of
statutory construction, the more recent enactment prevails.  Id. § 311.025(a)
(West 2005); Horizon/CMS Healthcare Corp. v. Auld, 34 S.W.3d 887, 901
(Tex. 2000); Johnstone v. State, 22 S.W.3d 408, 409 (Tex. 2000). 

E. 
Abuse of Discretion

To
determine whether a trial court abused its discretion, we must decide whether
the trial court acted without reference to any guiding rules or principles; in
other words, we must decide whether the act was arbitrary or unreasonable.  Low
v. Henry, 221 S.W.3d 609, 614 (Tex. 2007); Cire v. Cummings,
134 S.W.3d 835, 838–39 (Tex. 2004).  An appellate court cannot conclude that a
trial court abused its discretion merely because the appellate court would have
ruled differently in the same circumstances.  E.I. du Pont de Nemours &
Co. v. Robinson, 923 S.W.2d 549, 558 (Tex. 1995); see also Low, 221
S.W.3d at 620.

          An
abuse of discretion does not occur when the trial court bases its decision on
conflicting evidence and some evidence of substantive and probative character
supports its decision.  Unifund CCR Partners v. Villa, 299 S.W.3d 92, 97
(Tex. 2009); Butnaru v. Ford Motor Co., 84 S.W.3d 198, 211 (Tex. 2002).

IV.  Sufficiency
of the Evidence Challenges

In
his sole issue, Chesser contends that no evidence exists supporting the
submission of the negligence of the settling defendants––Dr. Adedokun, Dr.
Ferree, and Dr. DeLange––to the jury in question 2 of the court’s charge and,
correspondingly, that no evidence exists to support the submission of the
settling defendants’ percentage of responsibility in question 3.  Specifically,
Chesser argues that there is no expert testimony of a standard of care
applicable to these three doctors, no evidence of any breach of any standard of
care, and no evidence that any breach of any standard of care by these three
doctors was a proximate cause of Chesser’s damages; in short, Chesser contends
that no evidence exists supporting the submission of these doctors’ negligence
to the jury.

In
their second and fourth issues, respectively, Appellees argue that legally and
factually insufficient evidence exists to support the jury’s finding in
question 1 that Hospital was negligent and in question 6 that LMS and Hospital
were engaged in a joint enterprise.

A.  No Evidence to Support
Submission

of Negligence of
Settling Doctors

          

In
addressing Chesser’s challenge to the legal sufficiency of the evidence to
support submission to the jury of the settling defendants’ negligence in
question 2 and of the settling defendants’ percentage of responsibility in
question 3,[2] we first examine the
comparative responsibility statute.  Texas Civil Practice and Remedies Code[3]
section 33.003 provides:

(a)        
The
trier of fact, as to each cause of action asserted, shall determine the
percentage of responsibility, stated in whole numbers, for the following
persons with respect to each person’s causing or contributing to cause in any
way the harm for which recovery of damages is sought, whether by negligent act
or omission, by any defective or unreasonably dangerous product, by other
conduct or activity that violates an applicable legal standard, or by any
combination of these:

 

(1)        
 each
claimant;

 

(2)        
 each
defendant;

 

(3)        
 each
settling person; and 

 

(4)        
 each
responsible third party who has been designated under Section 33.004.

 

(b)        
This
section does not allow a submission to the jury of a question regarding conduct
by any person without sufficient evidence to support the submission. 

 

Tex.
Civ. Prac. & Rem. Code Ann. § 33.003 (West 2008) (emphasis added).  Thus, if
legally sufficient evidence does not exist of the negligence of a settling
physician, his percentage of responsibility should not be submitted.  See id.
§ 33.003(b) (expressly prohibiting submission to jury of any person’s
percentage of responsibility absent legally sufficient evidence); Rehab.
Facility at Austin, Inc. v. Cooper, 962 S.W.2d 151, 154 (Tex. App.––Austin
1998, no pet.) (interpreting predecessor statute and holding that trial court
properly refused to submit settling defendant’s negligence to jury); see
also Tex. R. Civ. P. 278 (authorizing trial court to submit to jury only
questions raised by pleadings and evidence); Kroger Co. v. Betancourt,
996 S.W.2d 353, 358 (Tex. App.––Houston [14th Dist.] 1999, pet. denied) (holding
submission of question on comparative responsibility of settling defendant is
required only if evidence exists supporting liability on part of settling
defendant).  That is, section 33.003, the comparative responsibility statute,
does not provide any independent basis for submitting to the jury the
percentage of responsibility of a settling defendant absent evidence supporting
the submission.

          In
order to submit to the jury a defendant’s negligence in a health care liability
claim, there must be legally sufficient evidence of a duty to act according to
the applicable standard of care, of a breach of the standard of care, and of a
causal connection between the breach and the injury.  Morrell v. Finke,
184 S.W.3d 257, 271 (Tex. App.––Fort Worth 2005, pet. ref’d).  Expert testimony
is required to establish the governing standard of care and whether that
standard has been breached.  Rehab. Care Sys. of Am. v. Davis, 73 S.W.3d
233, 234 (Tex. 2002).  Likewise, expert testimony based on reasonable medical
probability is required to establish proximate cause.  Jelinek v. Casas,
328 S.W.3d 526, 532 (Tex. 2010); Park Place Hosp. v. Estate of Milo, 909
S.W.2d 508, 511 (Tex. 1995).

          We
have thoroughly reviewed the record and have looked specifically at every
record reference cited in Appellees’ brief as containing expert testimony or
evidence of the settling defendants’ negligence; Chesser is correct.  No expert
testimony exists in the record before us of a standard of care applicable to
these three doctors, no evidence exists of any breach of any standard of care,
and no evidence exists that any breach of any standard of care by these three
doctors was a proximate cause of Chesser’s damages.  Although Chesser called
each of the settling defendants to testify at trial, no testimony was elicited
from them concerning their respective standards of care, their breach of any
standard of care, or proximate cause.  The only expert testimony in the record
concerning the standards of care applicable to the settling defendants, any
breach of those standards of care, or any proximate cause is, as pointed out by
Chesser, wholly conclusory[4] and constitutes no
evidence.  See, e.g., Coastal Transp. Co., 136 S.W.3d at 232;[5]
Merrell Dow Pharms., Inc. v. Havner, 953 S.W.2d 706, 711–12 (Tex. 1997),
cert. denied, 523 U.S. 1119 (1998).

For
example, Dr. Stephen Koch, one of Chesser’s experts whose testimony Appellees
point to as providing evidence of the settling defendants’ standard of care,
breach, and causation, simply testified:

Q.  You render
opinions as an–as an expert witness in this case that Dr. Daddyo–Adedokun was
negligent in his care and treatment of Mr. Chesser, didn’t you?

 

A.  In my deposition,
yes.

 

Q.  And you rendered opinions
that that care and treatment was a proximate case [sic] of his injury, didn’t
you?

 

A.  That was one of
the–one of the factors, yes.

 

Q.  Okay.  So you’re–you’ve
been a–an expert against–with respect to the care and treatment of Dr.
Adedokyn.  You also rendered opinions that Dr. Ferree was negligent in his care
and treatment of Mr. Chesser at LifeCare, didn’t you?

 

A.  During the
treatment at LifeCare, yes.

 

Q.  And you rendered
the opinion that care and treatment was a proximate cause of his injury, didn’t
you?

 

A.  Yes.[6]

 

Case
law uniformly holds that such conclusory testimony constitutes “no evidence.”  See,
e.g., Wal-Mart Stores, Inc. v. Merrell, 313 S.W.3d 837, 839 (Tex. 2010)
(holding evidence legally insufficient to support causation because “Dr. Beyler
may be qualified in fire research, but his testimony in this case lacks
objective, evidence-based support for its conclusions”); City of San Antonio
v. Pollock, 284 S.W.3d 809, 820 (Tex. 2009) (holding evidence legally
insufficient to support causation because “Patel’s opinions were conclusory and
provided no evidence”); Coastal Transp. Co., 136 S.W.3d at 232; Havner,
953 S.W.2d at 711–12.  Expert testimony utilizing the “magic words” of “negligence”
and “proximate cause” constitutes no evidence if the testimony is simply the
expert’s bare opinion; it is the substance of the testimony that must be
considered.  Havner, 953 S.W.2d at 711–12; see also McIntyre v.
Ramirez, 109 S.W.3d 741, 749 (Tex. 2003) (“A conclusory statement of an
expert witness is insufficient to create a question of fact.”).  Here, there is
no substantive testimony regarding the standard of care, breach, and causation
concerning the alleged medical negligence of Drs. Adedokun, Ferree, and DeLange
in their care and treatment of Chesser.  At most, the record contains only a
bare recitation of an expert’s prior opinion using the magic words of
negligence and proximate cause.  Because the only evidence concerning the
alleged medical negligence of Drs. Adedokun, Ferree, and DeLange is conclusory
expert testimony, no evidence exists supporting submission of the negligence of
these doctors to the jury.[7]  We sustain Chesser’s
sole issue.

          We
next address what effect sustaining Chesser’s sole issue has on the judgment.[8] 
The settling defendants paid a total of $183,000 in damages and $48,334 in
costs to settle Chesser’s claims against them.   Prior to trial, Appellees
elected the percentage settlement credit.  See Tex. Civ. Prac. &
Rem. Code Ann. § 33.012(c)(2) (West 2008).  The percentage of responsibility that
the jury attributed to the settling defendants totaled 10%.  Accordingly, to
effectuate the settlement credit elected by the Appellees, the judgment signed
by the trial court applied a settlement credit of $377,383.53.[9]
 The judgment subtracts the settlement credit of $377,383.53 from the total damages
awarded in the judgment.  The judgment also subtracts $48,334 from the court costs
recoverable by Chesser.    

          The
issue of the amount of the settlement credit to be applied to the judgment is
controlled by section 33.012 of the civil practice and remedies code, titled, “Amount
of Recovery.”  See id. § 33.012.  It provides in pertinent part:

(b)  If the claimant
has settled with one or more persons, the court shall further reduce the amount
of damages to be recovered by the claimant with respect to a cause of action by
the sum of the dollar amounts of all settlements.

 

(c)  Notwithstanding
Subsection (b), if the claimant in a health care liability claim filed under
Chapter 74 has settled with one or more persons, the court shall further reduce
the amount of damages to be recovered by the claimant with respect to a cause
of action by an amount equal to one of the following, as elected by the
defendant:

 

(1)        
the
sum of the dollar amounts of all settlements; or

 

(2)  a percentage
equal to each settling person’s percentage of responsibility as found by the
trier of fact.

 

(d)  An election made
under Subsection (c) shall be made by any defendant filing a written election
before the issues of the action are submitted to the trier of fact and when
made, shall be binding on all defendants.  If no defendant makes this election
or if conflicting elections are made, all defendants are considered to have
elected Subsection (c)(1).

 

Id. 

          Because
no evidence exists supporting submission of the settling defendants’ negligence
to the jury, their percentage of responsibility should not have been submitted
and no percentage of responsibility should have been allocated by the jury to
the settling defendants; indeed, how could the jury assess a percentage of
responsibility to the settling defendants in the absence of legally sufficient
evidence of their negligence?  And because, based on the evidence, no
percentage of responsibility should have been allocated to the settling defendants,
Appellees cannot be entitled to a percentage-of-responsibility settlement
credit.  See id. §§ 33.003(b), .012(c)(2).  

But,
section 33.012(b) provides that when a claimant has settled with a person, the
court shall reduce the claimant’s damages by the dollar amount of all
settlements.  Id. § 33.012(b).  And section 33.012(d) provides that even
if a defendant in a health care liability claim forgets to, or simply fails to,
make any election concerning a settlement credit, then nonetheless the
dollar-for-dollar settlement credit applies.  See id. § 33.012(d). So,
in this case, under either subsection (b) or subsection (d), Appellees are
entitled to a dollar-for-dollar settlement credit equal to $183,000—the damages
paid in settlement by the settling defendants.[10]  

In
the judgment, after application of the relevant damage cap provisions to the
damages found by the jury, the trial court further reduced the damages by the
percentage settlement credit of $377,383.53.  Based on our holding above, the
judgment should not be reduced by the percentage-of-responsibility settlement
credit of $377,383.53, but nonetheless must be reduced pursuant to either
section 33.012, subsection (b) or subsection (d), by the dollar-for-dollar
settlement credit amount of $183,000.[11]  Accordingly, we reverse
the portion of the trial court’s judgment applying the $377,383.53 percentage
settlement credit and render judgment applying the $183,000 dollar-for-dollar
settlement credit.  See Tex. R. App. P. 43.2(c), 43.3. 

B.  Sufficiency of
Evidence to Support Joint Enterprise Finding;

No Evidence of
Community of Pecuniary Interest in the

Common Purpose of the
Enterprise Between Appellees

 

          In
their fourth issue, Appellees assert that legally and factually insufficient
evidence exists to support the jury’s finding in question 6 that a joint
enterprise existed between LMS and Hospital.  Specifically, Appellees challenge
the sufficiency of the evidence to support the second two elements of joint
enterprise: (3) a community of pecuniary interest in the common purpose of the
enterprise among the members; and (4) an equal right to a voice in the
direction of the enterprise, which gives an equal right of control.

The
Texas Supreme Court has addressed legal sufficiency challenges to the third
element, the community-of-pecuniary-interest-in-the-common-purpose-of-the-enterprise
element, of a jury’s joint enterprise finding in several cases.  See St.
Joseph Hosp., 94 S.W.3d at 531–33 (holding evidence legally insufficient); Tex.
Dep’t of Transp. v. Able, 35 S.W.3d 608, 613–14 (Tex. 2000) (holding
evidence legally sufficient); Blount v. Bordens, Inc., 910 S.W.2d 931,
932 (Tex. 1995) (holding evidence legally insufficient); Shoemaker v. Estate
of Clyde Whistler, 513 S.W.2d 10, 15–17 (Tex. 1974) (holding evidence
legally insufficient).  A review of these cases makes it clear that to satisfy
this element of a joint enterprise, evidence must exist of a monetary interest
in the enterprise common to each member of the enterprise; the monetary interest
of each member of the group in the enterprise must be “shared without special
or distinguishing characteristics.”  St. Joseph Hosp., 94 S.W.3d at 531;
see also Able, 35 S.W.3d at 614 (holding legally sufficient evidence of
this element existed when written agreement between members of enterprise
specifically mentioned investment of substantial sums for mass transit
purposes); Shoemaker, 513 S.W.2d at 17 (holding that two joint owners of
an aircraft had “no pecuniary interest in the common purpose of the search”
that was occurring when the plane crashed and Shoemaker’s son was killed).

          We
have carefully reviewed the record as well as nine boxes of original exhibits
filed with this court.  The record before us “discloses a complete absence of
evidence of a vital fact,” that being a community of pecuniary interest in the
common purpose of the enterprise that existed between Appellees.  See Uniroyal
Goodrich Tire Co., 977 S.W.2d at 334 (requiring appellate court to sustain
legal sufficiency challenge when record discloses a complete absence of
evidence of a vital fact).  The evidence establishes that Hospital is managed
by LMS and that LMS manages two other Texas hospitals, one in Plano and one in
Dallas.  As evidence supporting the jury’s joint enterprise finding, Chesser
points to the following:  the testimony of William R. Fox, who was formerly
Senior Vice President of Operations of LMS; the governing board bylaws
governing Appellees’ relationship with one another; a governing board orientation
policy promulgated by LMS;[12]
the testimony of Elizabeth Higgenbotham, an expert in the area of health care
management, consultation, medical/legal, risk management, and health care
systems and operations; and the testimony of Dr. Koch.  This evidence
unquestionably establishes that LMS was the “umbrella” organization over
Hospital; that Hospital was to operate as a for-profit, long-term acute care
specialty hospital; that per the governing board bylaws, LMS was to “review
annual operating and capital budgets” of Hospital; and that per the governing
board bylaws, LMS was to oversee Hospital’s budget.

          Chesser
points to no evidence, however, and we have located none in the record, showing
how the monies generated by Hospital were allocated or shared between Hospital
and LMS.  See St. Joseph Hosp., 94 S.W.3d at 531; David L. Smith
& Assocs., L.L.P. v. Stealth Detection, Inc., 327 S.W.3d 873, 878–79
(Tex. App.––Dallas 2010, no pet.) (holding legally insufficient evidence of
joint enterprise between companies existed despite evidence of shared officers,
directors, employees, business address, logo, and assets when no evidence
existed of how or whether monetary benefits were shared between the two
entities).  Similarly, the record contains no evidence of how the monies
generated by LMS were allocated or shared between Hospital and LMS.  See St.
Joseph Hosp., 94 S.W.3d at 531; David L. Smith & Assocs., L.L.P.,
327 S.W.3d at 878–79.  The mere existence of monetary benefits to both Hospital
and LMS by virtue of their relationship is insufficient to establish the third
element of a joint enterprise; there must be evidence that the monetary
benefits were shared among the members of the enterprise without special or
distinguishing characteristics.  See St. Joseph Hosp., 94 S.W.3d at 531;
David L. Smith & Assocs., L.L.P., 327 S.W.3d at 878–79; see also
Blount, 910 S.W.2d at 933 (explaining that circumstantial evidence that
could give rise to any number of inferences was insufficient to satisfy third
element of joint enterprise); Omega Contracting, Inc. v. Torres, 191
S.W.3d 828, 851 (Tex. App.––Fort Worth 2006, no pet.) (holding evidence was
legally insufficient on third element of joint enterprise because although both
entities of the alleged joint enterprise “contemplated economic gain,” “that
gain was not shared without special or distinguishing characteristics,” but
instead one entity passed along revenue attributable to work of the other and
kept for itself revenue attributable to the work of its own drivers). 

Chesser
argues that Hospital and LMS (along with the other two hospitals managed by
LMS) utilized shared billing, shared managed care contracting, and shared
financial, legal, administrative, and human resources departments to make
better use of resources for economic gain.  Fox testified that there was a
centralized human resource function at the corporate office but that each
hospital had its own human resource representative.  The pooling of resources
between members of a joint enterprise to further the economic gain of the enterprise
is a factor the supreme court has looked at in determining whether evidence of
a community of pecuniary interest in the common purpose of the enterprise among
the members exists.  See Able, 35 S.W.3d at 613–14.  In Able, the
documents executed between the parties “clearly contemplate[d] an economic gain
that could [have been] realized by undertaking the activities in the [pooling]
manner.”  Id.  Here, although some centralized functions were undertaken
by LMS on behalf of Hospital, no evidence exists that any financial gain from
this pooling was shared between Appellees without special or distinguishing
characteristics.  Unlike in Able, the record here simply does not
indicate what the monetary consequence of the “pooling” of resources pointed to
by Chesser is for either Hospital or LMS.

Considering
all of the evidence in the light most favorable to the third element of the
jury’s joint enterprise finding, we hold that no evidence exists of a community
of pecuniary interest in the common purpose of the enterprise between Hospital
and LMS.[13]  See St. Joseph Hosp.,
94 S.W.3d at 531; David L. Smith & Assocs., L.L.P., 327 S.W.3d at
878–79; Omega Contracting, Inc., 191 S.W.3d at 851.  We sustain
Appellees’ fourth issue.

We next address what effect sustaining Appellees’ fourth issue has
on the judgment.  The purpose of the theory of joint enterprise is to make each
party to the enterprise the agent of the other and thereby to hold each
responsible for the negligent act of the other.  See, e.g., Able,
35 S.W.3d at 616 (recognizing that “each party in a joint enterprise is
responsible for the negligent act of the other”); Shoemaker, 513 S.W.2d
at 16 (explaining that “the negligence of pilot Carroll is to be imputed to
joint owner Whistler, thus establishing the vicarious liability of Whistler”). 
Here, in the percentage of liability question, the jury apportioned 60%
responsibility to Hospital and 30% responsibility to LMS.  Based on the jury’s
joint enterprise finding, the final judgment imposes joint and several
liability on both Appellees for the entire judgment.  The result of our holding
that legally insufficient evidence exists to support the jury’s joint
enterprise finding is that LMS (because it was found to be 30% responsible and
because it cannot be held vicariously liable for Hospital’s negligence per the
joint enterprise finding) is responsible for only 30% of the total judgment and
is not jointly and severally liable with Hospital for the entire judgment
amount.  See Tex. Civ. Prac. & Rem. Code Ann. § 33.013(a), (b)(1)
(providing that a liable defendant is responsible for only the percentage of
damages found by the trier of fact equal to the defendant’s negligence unless
the percentage of responsibility is greater than 50%, in which case the
defendant is jointly and severally liable for all damages recoverable by the
claimant).  Accordingly, we modify the judgment to delete LMS’s joint and
several liability and render judgment that it is liable for only 30% of the
total judgment amount.

C.  Sufficiency of
Evidence to Support Proximate Cause Element

of Negligence Finding
Against LMS

 

Chesser
alleged negligence against LMS, claiming that, as the manager of Hospital, LMS
was directly responsible for managing, controlling, directing, operating,
supervising, and evaluating the care, services, competence, and quality of care
and services provided at Hospital.  Chesser alleged that LMS created policies,
procedures, bylaws, rules, and regulations that governed Hospital and that LMS
was responsible for ensuring that the policies and procedures it implemented
were in fact instituted and evaluated and that Hospital complied with them.  In
Appellees’ second issue, LMS argues that legally, or alternatively factually,
insufficient evidence exists to support the jury’s finding of negligence
against it in question 1.[14]  LMS specifically
alleges that the evidence is insufficient to show that any breach of the
standard of care by LMS was in reasonable medical probability a proximate cause
of Chesser’s injuries.[15]  As set forth below, the
evidence is legally and factually sufficient to support the jury’s finding that
LMS’s negligence––in failing to promulgate policies and procedures relating to
post-PEG procedure patients and job descriptions for nurses in the procedure
room and in failing to ensure or monitor the enforcement of LMS’s policies and
procedures at Hospital––proximately caused Chesser’s injuries.

1. 
The Definitions of Negligence and Proximate Cause Concerning LMS

In
the absence of an objection to a definition, when reviewing the legal and
factual sufficiency of the evidence, we measure the evidence against the charge
given, applying the definitions given.  See St. Joseph Hosp., 94 S.W.3d
at 530.  The court’s charge defined “negligence,” when used with respect to the
conduct of LMS, to mean

failure to use
ordinary care, that is, failing to do that which a long-term acute care
hospital management company of ordinary prudence would have done under the same
or similar circumstances or doing that which a long-term acute care hospital
management company of ordinary prudence would not have done under the same or
similar circumstances.  

 

The
court’s charge defined “proximate cause” when used with respect to the conduct
of LMS to mean

that cause which, in
a natural and continuous sequence, produces an event, and without which cause
such event would not have occurred.  In order to be a proximate cause, the act
or omission complained of must be such that a long-term acute care hospital
management company using ordinary care would have foreseen that the event, or
some similar event, might reasonably result therefrom.  There may be more than
one proximate cause of an event.

 

2. 
The Law Concerning Negligence by LMS

A
hospital or a corporate health care provider may be liable for injuries arising
from the negligent performance of a duty that the hospital or corporate health
care provider owes directly to a patient. See Reed v. Granbury Hosp.
Corp., 117 S.W.3d 404, 409 (Tex. App.—Fort Worth 2003, no pet.); Denton
Reg’l Med. Ctr. v. LaCroix, 947 S.W.2d 941, 950 (Tex. App.—Fort Worth 1997,
pet. denied). One such duty is the duty to use reasonable care in formulating
the policies and procedures that govern the hospital’s medical staff and
nonphysician personnel.  Denton Reg’l Med. Ctr., 947 S.W.2d at 950.  In
cases involving alleged administrative negligence arising out of or relating to
the provision of medical services, the trier of fact must be guided by medical
expert testimony.  Mills v. Angel, 995 S.W.2d 262, 268 (Tex.
App.––Texarkana 1999, no pet.); Denton Reg. Med. Ctr., 947 S.W.2d at 950–51;
see Romero v. Baptist/St. Anthony’s Hosp. Corp., No. 07-00-00341-CV,
2001 WL 946497, at *2 (Tex. App.—Amarillo Aug. 16, 2001, no pet.) (not
designated for publication).

3. 
The Law Concerning Proximate Cause

Plaintiffs
in medical negligence cases are required to prove by a preponderance of the
evidence that the allegedly negligent act or omission was a proximate cause of
the harm alleged.  See Kramer v. Lewisville Mem’l Hosp., 858 S.W.2d 397,
400 (Tex. 1993).  The ultimate standard of proof on the causation issue “is
whether, by a preponderance of the evidence, the negligent act or omission is
shown to be a substantial factor in bringing about the harm and without which
the harm would not have occurred.”  Park Place Hosp., 909 S.W.2d at 511. 
The precise words of “reasonable medical probability” are not essential, but
evidence of causation must still rise above mere conjecture or possibility.  See
Duff v. Yelin, 751 S.W.2d 175, 176 (Tex. 1988).  The trier of fact may
decide the issue of proximate cause in medical malpractice cases based upon 
(1) general experience and common sense from which reasonable persons can
determine causation, (2) scientific principles provided by expert testimony
allowing the factfinder to establish a traceable chain of causation from the
condition back to the event, or (3) a probable causal relationship as
articulated by expert testimony.  Marvelli v. Alston, 100 S.W.3d 460,
470 (Tex. App.––Fort Worth 2003, pet. denied).  

4. 
Evidence Concerning LMS’s Negligence and Proximate Cause

Here,
although Dr. DeLange was in the procedure room on November 16 during the
insertion of Chesser’s PEG tube and was in charge of the procedure, Carol
Smith, R.N. testified that during the PEG procedure, she made the incision, she
helped thread the wire and the tube into Chesser’s stomach, and she tightened
the bolster.  She said Chesser’s was the first PEG procedure that she actually
performed.  Nurse Smith testified that Cindy Barnett, R.N. provided sedation to
Chesser during the procedure.

According
to Chesser’s expert Dr. Koch, after insertion of the PEG tube, Chesser’s
condition steadily declined.  He experienced extreme pain for days and became
confused as his mental state deteriorated.  On the afternoon of November 20,
Mrs. Chesser reported that Chesser had coughed and that bright red blood had squirted
out of his PEG tube.  At 6:30 that evening, Mrs. Chesser walked Chesser to the
restroom and saw him excrete bright red blood from his rectum, filling the
toilet.  Throughout November 20, Chesser’s blood pressure declined and
continued to decline despite the administration of 750cc’s of fluid.  Finally,
the head of Chesser’s bed was lowered in a maneuver called a Tendelenburg to
preserve the flow of blood to Chesser’s brain, and an ambulance was called.  Chesser
was admitted to Harris Hospital, and the next morning an endoscopy was
performed.

During
the endoscopy, Chesser suffered a heart attack and ultimately, although he was
successfully revived, sustained serious physical and neurological injuries.  He
was placed on a ventilator for an extended period of time and remained
hospitalized at Harris Hospital for several months.  He developed a series of
infections over the ensuing weeks to months related to the surgical incision
site where the PEG had been resected.  He developed bloodstream infections,
lung infections, and pneumonia; a trachestomy was required.

Dr.
Koch explained that the postoperative report of the endoscopy performed at
Harris Hospital and the pathology report from that procedure document that at
the PEG tube site, underneath the PEG bumper (also called a bolster),

[r]ight about where
the PEG was put in, the stomach, the whole length of the way through, the
stomach had died.  So it had died.  That tissue right under the PEG was dead. 
And it was bleeding.  Now that takes a period of time to develop.  About 48
hours, 24 to 72 hours, that time frame.

 

Dr.
Koch testified that necrosis does not just appear “out of the blue” but is preceded
by ischemia; Dr. Koch testified that the ischemia that Chesser suffered at the
PEG tube site was caused by the PEG tube bolster or bumper being too tight, “starting
to cut off the blood flow to the part of the stomach right below where it was
put - - pinching it.”  

The
documentary evidence in the record––LMS’s own records––establish that LMS as
the management company for Hospital was responsible for drafting, implementing,
and enforcing compliance with policies and procedures at Hospital.  By virtue
of the governing board bylaws, LMS controlled the board, and the board was expressly
“responsible for the quality of care” and “quality improvement mechanisms” at
Hospital.[16]  Expert Elizabeth Higgenbotham
testified that “the LMS voting members are the majority of the board.”  She
testified, 

[T]he policies and
procedures that we’re going to look at in this case go from the very top.  They
come from LMS, and they go to the hospitals.  So the policies and procedures,
and when we do a top down analysis, it’s literal.  The buck stops and starts
with those folks at the top.

 

Likewise,
Nurse Moore, the Director of Nursing at Hospital when Chesser was a patient
there, testified that she worked under policies and procedures that were
promulgated by LMS.  Nurse Moore testified that there were no polices or
procedures governing nurses in the procedure room or governing post-PEG tube insertion
patients.

Thus,
the record establishes by written documentary evidence as well as by expert
testimony that LMS had a duty to manage, control, direct, supervise, and evaluate
the care, services, competence, and quality of care and services provided at
Hospital; a duty to create policies, procedures, bylaws, rules, and regulations
that govern Hospital; and a duty to ensure that the policies and procedures it
implemented were in fact instituted and evaluated and that compliance was enforced
by Hospital.

Concerning
the specific breach of these duties in this case, Higgenbotham testified that
LMS was negligent because—despite the fact that under the governing board
bylaws, Hospital was only a “for profit, long-term acute care specialty
hospital” that possessed no operating room or anesthesia services––Hospital
permitted nurses to consciously sedate patients like Chesser and permitted nurses
to surgically insert PEG tubes into patients’ stomachs, including Chesser’s
stomach.[17]  Higgenbotham testified
that Hospital kept a log documenting the PEG procedures that had been performed
in examination rooms at Hospital since 1999.  She testified that LMS was aware
via Nurse Moore that PEG procedures were being performed at Hospital; yet,
despite LMS’s knowledge that PEG procedures were being performed at Hospital, LMS
failed to implement policies and procedures relating to a post-PEG insertion
care plan.  LMS also failed to implement any job description for a nurse’s
function in the procedure room with regard to insertion of PEG tubes, although
LMS was aware nurses were participating in this procedure.

Dr.
Koch testified that virtually all of Chesser’s injuries, including his hemorrhaging,
the code, and the consequences of those events, including Chesser’s cognitive
impairment,[18] would have been avoided
if the bolster around the PEG tube had not been too tight or had been loosened
on November 16, 17, or 18.[19]  

One
of the policies that was implemented by LMS at Hospital required the nurses to prepare
a care plan for each patient.  Nurse Moore agreed that every patient must have
a care plan.  The care plan is meant to be an interdisciplinary communication
tool enabling any and all medical personnel to look at the care plan at any
given point and “see what is going on with this patient.” Higgenbotham
testified that nursing implementation of a care plan for every patient is not
optional; instead, it is statutorily required of all registered nurses in Texas.
 The care plan is a “tool for communication because it is constantly updated.” 
Higgenbotham explained that if a care plan is not utilized, “you’re only doing
things like treating the symptoms, we don’t have a goal for the patient, and
nobody understands what the problem is.”  

Higgenbotham
testified, and Nurses Smith and Moore conceded, that the nurses at Hospital
failed to institute a care plan for Chesser.  Nurse Smith agreed that care
plans are an essential tool for communication between the team of doctors,
nurses, and other health care professionals caring for a patient.  Nurse Smith
also conceded that her job description mandated that she create a care plan for
all patients for collection of relevant data and to ensure that a care plan
exists; she conceded that she did not do so for Chesser.  Higgenbotham opined
that LMS was negligent in failing to ensure that care plans were utilized at
Hospital and were specifically utilized for Chesser.[20] 
Higgenbotham said, “I don’t really think there was a plan of care.  I think
there was an attempt to pencil-whip this document to make it look like there
was a plan of care.”[21]   

Higgenbotham
and Dr. Koch testified that had a care plan been utilized for Chesser, the severe
pain he was suffering would have been documented and would have been apparent
to all nurses and doctors caring for him.  Additionally, the total amount of
pain medication administered by different nurses and ordered by different
doctors would have been apparent.  Dr. Koch testified that he treated post-PEG
insertion patients about once a week and that the amount of pain medication
prescribed to Chesser “is substantially more than what I - - I have ever seen.” 
Chesser’s medical records demonstrated that he received a Duragesic patch and
continued to receive repeated doses of morphine.  Nurse Moore conceded that
Chesser’s medical chart reflected inconsistent pain assessments recorded at
different places in Chesser’s medical chart.[22]  Nurse Moore testified
that as the Director of Nursing, she was satisfied with this documentation.[23] 
Higgenbotham and Dr. Koch testified that had a nursing care plan been
implemented for Chesser, doctors then would have had enough information to know
to investigate an underlying cause of Chesser’s pain.  They explained that as
reflected in LMS’s policies, the main purpose of a care plan is to document
care, to provide for continuity of care, and to establish priorities for care. 


Higgenbotham
testified repeatedly that although LMS was responsible for formulating the
policies and procedures for Hospital, LMS wholly failed to institute any
mechanism to ensure that the policies and procedures it implemented were
actually followed at and utilized by Hospital.  Finally, Higgenbotham
explained, “And again, in LMS’s policies and procedures, they mimic what’s in
the Nurse Practice Act and the rules and regulations and what’s in the Federal
regulations.  But then when you go and examine the records, they’re not doing
it.”  

LMS’s
controverting evidence concerning its negligence and proximate cause included the
following:  Nurse Smith’s testimony that a care plan was not necessary in order
for a doctor or a nurse to give appropriate care; Nurse Smith’s testimony that
she was qualified and had taken a test establishing her competency to assist in
the performance of PEG procedures prior to Chesser’s procedure; Nurse Moore’s
testimony that nurses follow orders given by doctors and that the nurses did
that in caring for Chesser; expert Dorothy Ellford, R.N.’s testimony that LMS
was not negligent; and Nurse Moore’s testimony that Chesser’s records adequately
showed that the nurses addressed all problems he experienced as they arose.

5. 
Application of Legal Sufficiency Standard of Review

          Crediting
the evidence favorable to the jury’s finding that LMS’s negligence proximately
caused Chesser’s injuries, disregarding evidence contrary to the finding because
a reasonable factfinder assessing the credibility of the witnesses could, and
applying the definitions provided in the court’s charge, the evidence is
legally sufficient to establish that LMS’s negligence was a proximate cause of
Chesser’s injuries.  See City of Keller, 168 S.W.3d at 827.  That is,
the evidence is legally sufficient to support the jury’s finding that LMS
failed to use ordinary care by failing to do that which a long-term acute care
hospital management company of ordinary prudence would have done under the same
or similar circumstances.  LMS, a management company “morally and legally” responsible
by virtue of written governing board bylaws for “outcomes of all service
provided to its patients,” failed to generate policies and procedures
governing the care of patients post-PEG tube insertion, failed to draft or
implement job descriptions for nurses working in the procedure room and performing
or assisting in PEG tube procedures or any other procedures, and failed to
check or monitor that Hospital in fact used or implemented any of the policies
and procedures generated by LMS.  

Dr.
Koch testified that all of Chesser’s injuries were attributable to the too-tight
bolster around his PEG tube and that all of Chesser’s injuries could have been
avoided if only the bolster had been loosened on November 16, 17, or 18.  Higgenbotham
and Dr. Koch testified, and Nurse Smith conceded, that despite policies
requiring a care plan for every patient and despite Nurse Smith’s job
description requiring a care plan for every patient, no nursing care plan
existed for Chesser after the PEG tube was inserted.  Higgenbotham and Dr. Koch
testified that a care plan for Chesser would have documented and alerted
doctors to his severe pain.  Dr. Koch explained that the doctors took
appropriate action on Chesser’s behalf based on what was discernable from his
medical records and in the absence of a care plan.  This evidence is sufficient
to enable reasonable and fair-minded people to reach the conclusion that it was
more likely than not that LMS’s failure to generate policies and procedures
governing care of patients post-PEG tube insertion, failure to draft or
implement a job description for nurses working in the procedure room and performing
or assisting in PEG tube procedures, and failure to check or monitor that
Hospital in fact used or implemented any of the policies and procedures
generated by LMS, including the policies requiring a nursing care plan for
every patient, caused the tightness of Chesser’s PEG bolster to go unexamined
and unaddressed, leading in a continuous sequence to all of his injuries.[24]
 The jury could reasonably have concluded that LMS’s negligence was shown by a
preponderance of the evidence to be a substantial factor in bringing about Chesser’s
injuries stemming from the too-tight bolster and that if LMS had not been
negligent, the bolster’s tightness either would not have occurred or would have
been checked and discovered either via a post-PEG tube insertion patient care
policy, via a policy concerning the role and supervision of nurses in the
procedure room, or via a properly instituted and maintained care plan
documenting Chesser’s continued post-PEG tube insertion pain.[25] 
See Park Place Hosp., 909 S.W.2d at 511; see also Marvelli, 100
S.W.3d at 470.  

6. 
Application of Factual Sufficiency Standard of Review

          Likewise,
viewing all of the evidence, the evidence supporting the jury’s finding in question
1 that LMS’s negligence was a proximate cause of Chesser’s injuries is not so
weak, nor is the evidence to the contrary so overwhelming, that the jury’s
answer should be set aside and a new trial ordered.  See Garza, 395
S.W.2d at 823.  Indeed, Appellees do not point to specific evidence as
constituting overwhelming contrary evidence concerning proximate cause. 
Instead, without a factual sufficiency analysis, in one sentence Appellees
assert alternatively that not only does less than a scintilla of evidence
support the jury’s finding that LMS was negligent, but also that the evidence
and inferences supporting the finding are so weak or that some unidentified
evidence to the contrary is so overwhelming that this court should reverse and
remand for a new trial.  We have carefully reviewed the entire record in
detail, and we hold that the evidence supporting the jury’s answer to question
1 finding LMS negligent is not so weak nor the contrary evidence so
overwhelming that a new trial is required.  

We
overrule Appellees’ second issue.

V.  Charge Error

In
their first and third issues, respectively, Appellees argue that the trial
court erred by refusing to submit a charge instruction on unavoidable accident
and by submitting an erroneous definition of joint enterprise.

A.  No
Error in Refusing to Submit Unavoidable Accident Instruction

In
their first issue, Appellees argue that the trial court abused its discretion
by refusing to submit an unavoidable accident instruction.  Appellees contend
that “the complications Mr. Chesser suffered (including infection, hemorrhage,
migration or dislodgement of the tube, erosion and injury to organs) are
recognized complications of the PEG tube procedure and are complications that
may occur without anyone’s negligence.”  [Internal record citations omitted.] Appellees
also contend that Chesser’s pre-existing conditions––diabetic neuropathy and
cerebrovascular disease––could have been a cause of his injuries, entitling Appellees
to an unavoidable accident instruction.  

An
unavoidable accident “is an event not proximately caused by the negligence of
any party to it.”  Reinhart v. Young, 906 S.W.2d 471, 472 (Tex. 1995)
(quoting Dallas Ry. & Terminal Co. v. Bailey, 250 S.W.2d 379, 385
(Tex. 1952)); Young v. Thota, 271 S.W.3d 822, 836–37 (Tex. App.––Fort
Worth 2008, pet. denied).  The purpose of an unavoidable-accident instruction
is to 

advise the jurors, in
the appropriate case, that they do not have to place blame on a party to the
suit if the evidence shows that conditions beyond the party’s control caused
the accident in question or that the conduct of some person not a party to the
litigation caused it.

 

Dillard,
157 S.W.3d at 432 (citing Reinhart, 906 S.W.2d at 472).  An unavoidable
accident instruction thus submits a defendant’s inferential rebuttal defense—a
defense that operates to rebut an essential element of the plaintiff’s case by
proof of other facts.  Id.  The instruction is most often used to
inquire about the causal effect of some physical condition or circumstance such
as fog, snow, sleet, wet or slick pavement, or obstruction of view or to
resolve a case involving a very young child who is legally incapable of
negligence.  Reinhart, 906 S.W.2d at 472.  It is within the trial court’s
discretion to submit an unavoidable accident instruction when the evidence
supports the conclusion that no one was negligent.  Accord In re
V.L.K., 24 S.W.3d 338, 340 (Tex. 2000) (explaining that trial court’s
decision to submit or to refuse a particular jury instruction is reviewed under
an abuse of discretion standard); La.-Pac. Corp. v. Knighten, 976 S.W.2d
674, 676 (Tex. 1998) (recognizing that trial courts have great latitude and
considerable discretion to determine necessary and proper jury instructions).

Here,
although the trial court did not submit an unavoidable accident instruction, a “bad
result” instruction was submitted.  See Tex. Civ. Prac. & Rem. Code
Ann. § 74.303(e)(2) (West 2011) (requiring this instruction in all health care
liability claims filed after September 1, 2003 and tried to a jury); see
also Comm. on Pattern Jury Charges, State Bar of Tex., Texas Pattern
Jury Charges: Malpractice, Premises, Products PJC 50.7 (2006).  The bad
result instruction informed the jury that “[a] finding of negligence may not be
based solely on evidence of a bad result to Curtis Paul Chesser, but a bad
result may be considered by you, along with other evidence, in determining the
issue of negligence.  You are the sole judges of the weight, if any, to be
given to this kind of evidence.”  Tex. Civ. Prac. & Rem. Code Ann. §
74.303(e)(2).  The bad result instruction, by telling the jury that it could
not base a finding of negligence solely on evidence of a bad result, adequately
submitted Appellees’ theories that the complications Chesser suffered
(including infection, hemorrhage, migration or dislodgement of the tube, and erosion
and injury to organs) are recognized complications of the PEG tube procedure
and are complications that may occur without anyone’s negligence and that
Chesser’s injuries could have been caused by his pre-existing conditions.  Accord
Dillard, 157 S.W.3d at 432 (explaining that instead of examining whether
evidence existed to support submission of multiple instructions, “we think it
more appropriate to examine the adequacy of the charge that was given”).  That
is, the bad result instruction sufficiently informed the jury that it could
believe that Chesser simply had a bad result with the PEG tube or that the bad
result could have been caused by his pre-existing conditions and instructed the
jury that a bad result alone would not support a negligence finding against
Appellees.  See id. at 430 (explaining that unavoidable accident
instruction sufficiently informed jury of and submitted defendant’s sole
proximate cause inferential rebuttal defense that fatal auto accident was not
caused by defendant’s negligence but by presence of cattle on the roadway); Williams
v. Viswanathan, 64 S.W.3d 624, 628–29 (Tex. App.––Amarillo 2001, no pet.)
(holding that evidence existed to support bad result instruction when doctor
admitted that patient’s care worsened under his care but denied that he was
negligent).  Looking to the adequacy of the charge given, because the bad
result instruction sufficiently informed the jury that it could not find
Appellees negligent solely based on a bad result suffered by Chesser from the
PEG tube or from his pre-existing conditions, the trial court did not abuse its
discretion by refusing to also submit an unavoidable accident instruction.  See
Dillard, 157 S.W.3d at 434 (explaining that redundancy created by
submission of multiple inferential rebuttal instructions is contrary to the
spirit of broad-form submission); V.L.K., 24 S.W.3d at 341 (recognizing
that trial court possesses considerable discretion to determine necessary and
proper jury instructions).  The bad result instruction submitted in this case,
based on these facts, adequately informed the jury about Appellees’ theories that
the complications Chesser suffered (including infection, hemorrhage, migration
or dislodgement of the tube, and erosion and injury to organs) are recognized
complications of the PEG tube procedure and are complications that may occur
without anyone’s negligence and that Chesser’s injuries could have been caused
by his pre-existing conditions, which were not the fault of anyone; Appellees
were entitled to nothing more.  See Dillard, 157 S.W.3d at 434.

We
overrule Appellees’ first issue.

B.  Alleged Error in Definition
of Joint Enterprise Submitted in Question 6

 

          In their
third issue, Appellees argue that the trial court erred by submitting, over Appellees’
objection and timely tender of a requested definition, a legally incorrect
definition of joint enterprise in connection with question 6 in the court’s
charge.  The court’s charge contained the following definition of joint
enterprise:

A “joint enterprise”
exists if the persons concerned have (1) an agreement, either express or
implied, with respect to the enterprise or endeavor; (2) a common purpose; (3)
a community of pecuniary interest in the common purpose of the enterprise among
the members; and (4) an equal right to a voice in the direction of the
enterprise, which gives an equal right of control.

 

Appellees
requested, tendered, and objected to the trial court’s refusal to submit the
following definition of joint enterprise:  

A “joint enterprise”
exists if (1) individuals or entities are parties to an agreement, either
express or implied, (2) a common purpose to be carried out by the group;
(3) a community of pecuniary interest in the common purpose of the enterprise
among the members; and (4) an equal right to a voice in the direction of the
enterprise, which gives an equal right of control. [Emphasis added.]

 

Appellees
complain on appeal that the exclusion of the language italicized above––“to be
carried out by the group”––from the definition of joint enterprise constituted
error and harmed Appellees.  

Because,
as set forth above, we have sustained Appellees’ fourth issue challenging the
legal sufficiency of the evidence to support the third element of a joint
enterprise––the
community-of-pecuniary-interest-in-the-common-purpose-of-the-enterprise
element––we need not address whether the failure to include the “to be carried
out by the group” language in the second element of the joint enterprise
definition submitted to the jury constituted error.  The definition requested
and the definition submitted are identical with respect to the third element of
a joint enterprise, and therefore, under either definition, the evidence is
legally insufficient to support the jury’s affirmative finding as to this third
element.  Accordingly, we need not and do not address Appellees’ third issue.  See
Tex. R. App. P. 47.1 (requiring appellate court to address only issues
necessary to final disposition of the appeal).

VI. 
Alleged Errors
in Judgment

 

In their
fifth issue, Appellees allege in four subparts that four specific errors exist in
the trial court’s judgment:  three subparts assert erroneous application of statutory
provisions, and one subpart asserts an abuse of discretion by the trial court. 
We address these contentions individually below applying the rules of statutory
construction and the abuse of discretion standard of review, as dictated by the
error alleged.

A.  Noneconomic
Damages

 

          In
their fifth issue, subpart A, Appellees argue that they are entitled to limit
their combined civil liability for noneconomic damages to $250,000 pursuant to
civil practice and remedies code section 74.301(b).  See Tex. Civ. Prac.
& Rem. Code Ann. § 74.301(b) (West 2011).  Section 74.301 provides, in its
entirety:

§ 74.301.  Limitation
on Noneconomic Damages

 

(a)  In an action on
a health care liability claim where final judgment is rendered against a
physician or health care provider other than a health care institution, the
limit of civil liability for noneconomic damages of the physician or health
care provider other than a health care institution, inclusive of all persons
and entities for which vicarious liability theories may apply, shall be limited
to an amount not to exceed $250,000 for each claimant, regardless of the number
of defendant physicians or health care providers other than a health care
institution against whom the claim is asserted or the number of separate causes
of action on which the claim is based.

 

(b)  In an action on
a health care liability claim where final judgment is rendered against a single
health care institution, the limit of civil liability for noneconomic damages inclusive
of all persons and entities for which vicarious liability theories may apply,
shall be limited to an amount not to exceed $250,000 for each claimant.

 

(c)  In an action on
a health care liability claim where final judgment is rendered against more
than one health care institution, the limit of civil liability for noneconomic
damages for each health care institution, inclusive of all persons and entities
for which vicarious liability theories may apply, shall be limited to an amount
not to exceed $250,000 for each claimant and the limit of civil liability for
noneconomic damages for all health care institutions, inclusive of all persons
and entities for which vicarious liability theories may apply, shall be limited
to an amount not to exceed $500,000 for each claimant.

 

Id. §
74.301.  Under chapter 74 of the civil practice and remedies code, the
definition of a “health care institution” specifically includes a “hospital.”  Id. § 74.001(a)(11)(G)
(West 2011).  And a health care institution is specifically included within the
definition of a “health care provider.”  Id. § 74.001(a)(12)(A)(vii). 
Finally, a manager of a health care provider is also defined as a health care
provider.  Id. § 74.001(a)(12)(B)(i).  

          Utilizing
these definitions prescribed by the legislature in section 74.001, because Hospital
is a hospital, it is a health care institution.  See id. § 74.001(a)(11)(G). 
As a healthcare institution, Hospital is also a health care provider.  Id.
§ 74.001(a)(12)(A)(vii).  And LMS, as the manager of health care provider Hospital
is itself a health care provider.  Id. § 74.001(a)(12)(B)(i).  The
judgment in this case was entered against Hospital and LMS.  Thus, the judgment
here was entered against a health care institution (Hospital) and against a health
care provider (LMS).

Given
these prescribed definitions and their application to Appellees, and inserting
those applications into the plain language of section 74.301’s limitation on
noneconomic damages provisions, it is clear that both subsection (a) and
subsection (b) apply to this judgment, triggering the two separate damage caps
set forth individually in subsection (a) and subsection (b), and that
subsection (c) does not apply to this judgment.  Subsection (a) applies when a
final judgment is rendered against a health care provider other than a health
care institution; that is, subsection (a) applies to health-care-provider LMS
but not to health-care-institution Hospital.  Subsection (b) applies when a
final judgment is rendered against a single health care institution; so subsection
(b) applies here because Hospital is the only, the single, health care institution
against which the judgment here was entered.  Subsection (c) applies only when
final judgment is rendered against more than one health care institution;
subsection (c) does not apply here because the judgment does not render
judgment against more than one health care institution––Appellee Hospital is
the sole health care institution against whom judgment was rendered.  

Having
determined that section 74.301, subsections (a) and (b) are both applicable to
the present judgment, we next examine the limitation on noneconomic damages
contained in each subsection.  Subsection (a) limits the noneconomic damages
liability of a health care provider, other than a health care institution, “inclusive
of all persons and entities for which vicarious liability theories may apply,” to
$250,000 for each claimant regardless of the number of defendant health care
providers, other than a health care institution, against whom the claim is
asserted or the number of separate causes of action on which the claim is
based.  Id. § 74.301(a).  Thus, here, subsection (a) limits the
noneconomic damages liability of health-care-provider LMS (but does not apply
to health-care-institution Hospital) to $250,000.  See id.  Subsection
(b) limits the noneconomic damages liability of a health care institution that
is the only health care institution against whom final judgment is rendered to
an amount not to exceed $250,000 for each claimant inclusive of all persons and
entities for which vicarious liability theories may apply.  Id. §
74.301(b).  Thus, here, subsection (b) limits the noneconomic damages liability
of health-care-institution Hospital (as the single health care institution
against whom judgment was rendered) to $250,000.  See id.  Both
subsections (a) and (b) apply to the judgment at issue here, limiting
separately the noneconomic damages civil liability of both LMS and Hospital to
$250,000 each.

          Appellees
nonetheless contend that because––in addition to the direct liability theories
of recovery that Chesser pleaded against LMS––Chesser pleaded that LMS was
vicariously liable for Hospital’s negligence and that a joint enterprise
existed between LMS and Hospital, the vicarious liability limitation of
subsection (a) applies.  That is, Appellees contend that because Chesser
pleaded that LMS was vicariously liable for Hospital’s negligence and pleaded
that a joint enterprise existed between Appellees, and because subsection (a)
provides that health-care-provider LMS’s limit of liability for nonecomomic
damages is “inclusive of all persons and entities for which vicarious liability
theories may apply,” including Hospital’s here, only subsection (a) applies to
the judgment here.  We could hypothesize about various fact patterns and
scenarios under which Appellees’ argument might have some traction.  This
situation, however, is not one of them.

First,
here, as set forth above, the evidence is legally insufficient to support the jury’s
joint enterprise finding.  Subsection (a)’s vicarious liability language therefore
cannot apply to Hospital based on a joint enterprise theory of vicarious
liability.  Second, also as set forth above, the instructions and definitions
given to the jury in connection with the negligence question, question 2,
submitted to the jury only the issue of LMS’s and Hospital’s direct liability.[26] 
The jury did not make any other fact finding that would support the imposition
of vicarious liability on LMS for Hospital’s breach of its direct duties to
Chesser.  See, e.g., St. Joseph Hosp., 94 S.W.3d at 537–38 (discussing
various theories of vicarious liability); accord Obstetrical &
Gynecological Assocs., P.A. v. McCoy, 283 S.W.3d 96, 105 (Tex.
App.––Houston [14th Dist.] 2009, pet. denied) (recognizing that purely
vicarious liability claim against entity, as opposed to direct liability claim,
did not require expert report in addition to report filed regarding doctor
employed by entity).  Thus, absent some fact finding that would support
imposition of vicarious liability on LMS for Hospital’s direct liability to
Chesser, the plain language of section 74.301(a)’s “inclusive of all persons
and entities for which vicarious liability theories may apply” provision cannot
be applicable to impose vicarious liability on LMS for Hospital’s direct
liability to Chesser.

We
overrule subpart A of Appellees’ fifth issue.

B.  Prejudgment
Interest

 

          In
subpart C of their fifth issue, Appellees contend that the trial court erred by
awarding prejudgment interest on past noneconomic damages.  Appellees do not
challenge any aspect of the computation of prejudgment interest; their sole
argument is that because the noneconomic damages awarded by the jury exceeded
the statutory noneconomic damages limit of $250,000 set forth in section
74.301, prejudgment interest is not available.  That is, Appellees contend that
section 74.301’s $250,000 limit on their civil liability for noneconomic
damages is inclusive of prejudgment interest on past noneconomic damages.

          As
authority for their position, Appellees cite section 74.002 of the civil practice
and remedies code and Molinet v. Kimbrell, No. 09-0544, 2011 WL 182230 (Tex.
Jan. 21, 2011).  Section 74.002 states that, and Molinet stands for the
proposition that, in the event of a conflict between a provision of chapter 74
of the civil practice and remedies code and any other statute, rule of
procedure, or rule of evidence, chapter 74 trumps.  See Tex. Civ. Prac.
& Rem. Code Ann. § 74.002(a) (“In the event of a conflict between
this chapter and another law, including a rule of procedure or evidence, or
court rule, this chapter controls to the extent of the conflict.”); Molinet,
2011 WL 182230, at *5–6 (holding that the limitations provisions of section
74.251(a) and section 33.004(e) conflict and that section 74.251(a) prevails). 
Appellees claim that section 74.301’s $250,000 limitations on civil liability
for noneconomic damages conflicts with finance code sections 304.102 and
304.1045 authorizing prejudgment interest on past damages in a personal injury
action.[27]  See Tex. Fin.
Code Ann. §§ 304.102, .1045 (West 2006) (providing that a judgment in a
personal injury case earns prejudgment interest on past damages).

Section
74.301 limits civil liability for noneconomic damages.  See Tex. Civ.
Prac. & Rem. Code Ann. § 74.301.  “Noneconomic damages” is defined in
chapter 74 as having “the meaning assigned by section 41.001.”  Id. § 74.001(a)(20). 
Section 41.001 defines noneconomic damages as

damages awarded for
the purpose of compensating a claimant for physical pain and suffering, mental
or emotional pain or anguish, loss of consortium, disfigurement, physical
impairment, loss of companionship and society, inconvenience, loss of enjoyment
of life, injury to reputation, and all other nonpecuniary losses of any kind
other than exemplary damages.

 

Id. §
41.001(12) (West 2008).  Section 41.001 also defines economic damages as “compensatory
damages intended to compensate a claimant for actual economic or pecuniary
loss; the term does not include exemplary damages or noneconomic damages.”  Id.
§ 41.001(4).  

Prejudgment
interest is a form of damages recognized in Texas law to compensate a claimant
for economic or pecuniary loss:  for lost use of money.  Columbia Hosp.
Corp. of Houston v. Moore, 92 S.W.3d 470, 472 (Tex. 2002); Cavnar v.
Quality Control Parking, Inc., 696 S.W.2d 549, 552 (Tex. 1985), abrogated
on other grounds by Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.,
962 S.W.2d 507, 533 (Tex. 1998); Shook v. Walden, 304 S.W.3d 910, 927
(Tex. App.––Austin 2010, no pet.) (explaining that the award of prejudgment
interest as damages derived from the concept that a judgment debtor wrongfully
deprives the judgment creditor of the amount of damages ultimately awarded in
the judgment between the time the damages accrue and the date of judgment).  Thus,
prejudgment interest does not and cannot fall within section 41.001’s
definition of noneconomic damages; instead, prejudgment interest falls within
section 41.001’s definition of economic damages because it is a form of damages
recognized in Texas law and intended to compensate for economic or pecuniary
loss suffered by a claimant for loss of use of money.  See Tex. Civ.
Prac. & Rem. Code Ann. § 41.001(4).  Because, as economic damages,
prejudgment interest is specifically excluded from section 41.001’s definition
of noneconomic damages, it likewise does not fall within chapter 74’s
definition of noneconomic damages.  See §§ 41.001(4), .001(12),
74.001(a)(20).

Giving
chapter 74 supremacy over the finance code, looking first and foremost to the words
of section 74.301 and utilizing the definitions prescribed by the legislature
in section 74.001, prejudgment interest does not fall within the statutory definition
of noneconomic damages—which are the only damages limited by section 74.301.  See
Tex. Gov’t Code Ann. § 311.011(b) (requiring us in statutory construction to
apply definitions provided by the legislature); Lexington Ins. Co., 209
S.W.3d at 85 (instructing that to give effect to legislature’s intent “we look
first and foremost to the words of the statute”).  Because prejudgment interest
is pecuniary in nature, because it does not fall within the definition of noneconomic
damages provided by the legislature in chapter 74, and because section 74.301’s
plain language limits only civil liability for noneconomic damages, we hold
that prejudgment interest is not included in section 74.301’s limit on civil
liability for noneconomic damages and that section 74.301 in no way conflicts
with finance code sections 304.102 or 304.1045.  And because Appellees make no
complaint concerning the amount or computation of prejudgment interest, we
overrule subpart C of Appellees’ fifth issue.

C.  Joint and Several
Liability

 

          In subpart
B of their fifth issue, Appellees alternatively contend that, to the extent the
noneconomic damage caps of both section 74.301(a) and (b) apply to the judgment
here, nonetheless Appellees cannot be jointly and severally liable for
imposition of the two $250,000 noneconomic damage awards.[28] 
A defendant is liable to a claimant only for the percentage of the damages
found by the trier of fact equal to that defendant’s percentage of
responsibility unless the percentage of responsibility attributed to the
defendant is greater than 50% or the defendant engaged in particular conduct
listed in the penal code.  See Tex. Civ. Prac. & Rem. Code Ann. §
33.013(a), (b) (West 2008).  Here, the jury found LMS 30% responsible and found
Hospital 60% responsible.  Based on our above holding that legally insufficient
evidence exists to support the jury’s joint enterprise finding and the fact
that the jury assessed only 30% responsibility against LMS, LMS cannot be jointly
and severally liable with Hospital for the entire judgment.  See id.; Able,
35 S.W.3d at 616 (recognizing that “each party in a joint enterprise is
responsible for the negligent act of the other”); Shoemaker, 513 S.W.2d
at 14 (same).  Consequently, we sustain subpart B of Appellees’ fifth issue to
the extent that it complains of LMS’s joint and several liability with Hospital
for the $250,000 statutorily-limited noneconomic damages award against Hospital
under section 74.301(b).

          We
next address whether Hospital (as a 60% responsible, jointly and severally
liable defendant under section 33.013(b)(1)) can be liable (by virtue of joint
and several liability) for the $250,000 noneconomic damages awarded pursuant to
section 74.301(a) against LMS in the judgment.  We hold that it cannot.  The
plain language of section 74.301(a) and (b) is to limit the civil liability of
the entities described in those subsections to $250,000 for noneconomic
damages.  See Tex. Civ. Prac. & Rem. Code Ann. § 74.301(a), (b).  Although
we found Appellees’ reliance on section 74.002 of the civil practice and
remedies code and Molinet v. Kimbrell inapplicable to our statutory
analysis concerning the statutory language and definitions concerning
prejudgment interest, these authorities do apply here to our analysis of
whether the imposition of joint and several liability on Hospital for the
$250,000 noneconomic damages awarded against LMS is prohibited by section
74.301(b).  

As
we previously mentioned, section 74.002 states that, and Molinet stands
for the proposition that, in the event of a conflict between a provision of
chapter 74 of the civil practice and remedies code and any other statute, rule
of procedure, or rule of evidence, chapter 74 trumps.  See id. §
74.002(a); Molinet, 2011 WL 182230, at *5–6.  Here, Texas Civil Practice
and Remedies Code section 33.013(b)(1)’s imposition of joint and several
liability on all defendants found to be greater than 50% responsible for capped
noneconomic damages attributable to another defendant conflicts with section
74.301’s limitation of civil liability for noneconomic damages owed by a health
care institution like Hospital.  Section 33.013(b)(1) provides that each liable
defendant is, in addition to being responsible for the percentage of damages in
accordance with the percentage of responsibility assessed against that
defendant by the jury, also “jointly and severally liable for the damages
recoverable by the claimant” if “the percentage of responsibility attributed to
the defendant with respect to a cause of action is greater than 50 percent.”  Tex.
Civ. Prac. & Rem. Code Ann. § 33.013(b)(1).  On the other hand, section
74.301(b) provides that “[i]n an action on a health care liability claim where
final judgment is rendered against a single health care institution, the limit
of civil liability for noneconomic damages . . . shall be limited to an amount
not to exceed $250,000.”  Id. § 74.301(b).  Thus, to the extent that section
33.013(b)(1) may statutorily make a health care liability defendant “jointly
and severally [civilly] liable” for noneconomic damages in excess of the
$250,000 cap on “civil liability” for noneconomic damages applicable to that health
care liability defendant under either section 74.301(a) or 74.301(b), the two
statutes conflict.  When another statute conflicts with a provision of chapter
74, chapter 74’s provision trumps.  See id. § 74.002(a); Molinet,
2011 WL 182230, at *5–6.[29]  Section 74.301(b) also
prevails over section 33.013(b)(1) to the extent of any conflict between the
two in a particular case because section 74.301 is more recently enacted than
section 33.013(b)(1) and is also more specific than section 33.013(b)(1).  See
Tex. Gov’t Code Ann. §§ 311.025(a), .026; Horizon/CMS Healthcare Corp.,
34 S.W.3d at 901.  We hold that section 74.301(b) prevails over section 33.013(b)(1)
when, as in this case, the statutes conflict.  We sustain this portion of
subpart B of Appellees’ fifth issue.  We modify the judgment to delete Hospital’s
joint and several liability for the $250,000 noneconomic damages awarded
against LMS.[30]

D.  Specific Annuity
Ordered

 

          In
subpart D of their fifth issue, Appellees argue that the trial court abused its
discretion by ordering a specific annuity to fund periodic payments for Chesser’s
future medical expenses.  Prior to trial, Appellees filed a “Conditional
Request for Periodic Payments of Future Damages of LifeCare Defendants.”  Appellees
requested that in the event either or both of them were found liable for future
damages, including future loss of earnings, that the trial court order such
damages be paid in whole or in part by periodic payments rather than by a lump
sum payment.  See Tex. Civ. Prac. & Rem. Code Ann. § 74.503(b) (West
2011) (providing that on motion of defendant or claimant the trial court may
order future damages other than medical, health care, or custodial services to
be paid in whole or in part in periodic payments).  

Appellees
did not limit their request that future damages be funded by periodic payments
to funding utilizing a particular entity.  Instead, after the jury returned its
verdict, Chesser and Appellees began investigating annuity options for periodic
payment of future damages.  At a hearing before the court, Chesser proposed
various options funded through American General Life Insurance Company.  Appellees
likewise proposed various periodic payment options funded through American General
Life Insurance Company.  Ultimately, the final judgment signed by the trial
court requires Appellees to 

assign their
obligations for the period payments to American General Annuity Service
Corporation, which will be funded through the purchase of an annuity policy
from American General Life Insurance Company, funded with $550,000, payments to
Plaintiff monthly, tax free, guaranteed for the life of Curtis Paul Chesser
with 119 months installment refund period.  

 

          Section 74.505(b) of the civil
practice and remedies code provides:

 

(b)  The judgment
must provide for payments to be funded by:

 

(1)  an annuity
contract issued by a company licensed to do business as an insurance company,
including an assignment within the meaning of Section 130, Internal Revenue
Code of 1986, as amended;

 

(2)  an obligation of
the United States;

 

(3)  applicable and
collectible liability insurance from one or more qualified insurers; or 

 

(4)  any other satisfactory
form of funding approved by the court.

 

Id. §
74.505(b) (West 2011); see also id. § 74.503(d) (setting forth other
information that must be included in the judgment when periodic payments of
future damages are ordered).

On
appeal, Appellees claim that the entirety of section 74.505, titled “Financial
Responsibility,” is inapplicable to the judgment here; they claim that section
74.505 applies only when a defendant requesting periodic payments of future
damages is not adequately insured.  Consequently, Appellees argue on appeal
that the trial court abused its discretion by including the information
required by section 74.505(b) in the judgment.  But in the trial court,
Appellees argued that section 74.505(c), requiring that “on termination of periodic
payment of future damages, the court shall order the return of the security, or
as much as remains, to the defendant” was applicable to the judgment here;
Appellees requested that language to this effect be included in the judgment,
and the judgment includes the requested language.[31] 
Id. § 74.505(c).  Because Appellees asserted in the trial court that
section 74.505 applied to the judgment and requested that language from section
74.505(c) be included in the judgment, and because such language was included
in the judgment, Appellees cannot now claim on appeal that section 74.505 does
not apply to the judgment or that the trial court abused its discretion by
applying section 74.505 to the judgment.  See, e.g., In re Dep’t of
Family & Protective Servs., 273 S.W.3d 637, 646 (Tex. 2009) (explaining
that the invited error doctrine applies to situations in which a party requests
the court to make a specific ruling, then complains of that ruling on appeal); Ne.
Tex. Motor Lines v. Hodges, 138 Tex. 280, 283, 158 S.W.2d 487, 488 (1942)
(explaining that a party cannot complain on appeal that the trial court took a
specific action that the complaining party requested).

In
any event, the trial court did not abuse its discretion by including language
in the judgment that required Appellees to 

assign their
obligations for the period payments to American General Annuity Service
Corporation, which will be funded through the purchase of an annuity policy
from American General Life Insurance Company, funded with $550,000, payments to
Plaintiff monthly, tax free, guaranteed for the life of Curtis Paul Chesser
with 119 months installment refund period.

 

See Low,
221 S.W.3d at 614 (explaining that a trial court abuses its discretion if
it acts arbitrarily and unreasonably without reference to guiding principles). 
The trial court was authorized by section 74.505(b) and section 74.503(c) and
(d) to include such language in the judgment.  We hold that the trial court did
not abuse its discretion by including the above quoted language in the
judgment.  Moreover, we hold that Appellees waived any complaint about the
application of section 74.505 to the judgment because they requested the application
of section 74.505(c) to the judgment in the trial court. 

We
overrule subpart D of Appellees’ fifth issue.

VII. 
Conclusion

 

          Having
sustained Chesser’s sole issue, we reverse that portion of the trial court’s
judgment applying a 10% percentage-of-responsibility settlement credit of
$377,383.50.  We modify the trial court’s judgment by changing the settlement
credit amount from a 10% percentage-of-responsibility settlement credit of
$377,383.50 to a dollar-for-dollar settlement credit of $183,000.  We render
judgment accordingly.

          Having
sustained Subpart B of the fifth issue of Appellees LifeCare Management
Services, L.L.C. (LMS) and LifeCare Hospitals of North Texas, L.P. d/b/a
LifeCare Hospital of Fort Worth (Hospital), we reverse that portion of the
trial court’s judgment subjecting both Hospital and LMS to civil liability for
the two capped $250,000 noneconomic damage awards.  We modify the judgment by imposing
several liability on Hospital and LMS for the capped $250,000 noneconomic
damages award attributable to each.  

Having
sustained Hospital and LMS’s sixth issue, we reverse the portion of the trial
court’s judgment imposing joint and several liability upon LMS for the entire
judgment.  We modify the trial court’s judgment so that in addition to being
severally liable for $250,000 in noneconomic damages plus prejudgment and
postjudgment interest on that amount, LifeCare Management Services is severally
liable for only 30% of the judgment (excluding Hospital’s $250,000 noneconomic
damage civil liability).  We render judgment against LMS accordingly.

Having
addressed all of the issues necessary to the disposition of this appeal that
were raised in Chesser’s appeal and in Hospital and LMS’s cross appeal, and
having, pursuant to Texas Rule of Appellate Procedure 43.2(a),(b) and (c),
reversed the trial court’s judgment in part, rendered the trial court’s
judgment in part, and modified the trial court’s judgment in part, we affirm
the remainder of the trial court’s judgment as modified.  

 

SUE WALKER
JUSTICE

 

PANEL: 
WALKER,
MCCOY, and MEIER, JJ.

 

DELIVERED: August 31, 2011









[1]Although LMS and Hospital
raise their issues as cross-appellants, we refer to them throughout this
opinion as “Appellees” for clarity and ease of reading.





[2]Appellees requested
questions 2 and 3, submitting the settling defendants’ negligence and
percentage of responsibility.  Chesser objected to the submissions and
subsequently filed a motion to disregard the jury’s finding that the settling
defendants were negligent and the finding apportioning a percentage of
responsibility to them.





[3]This appeal involves the
application of various sections of the civil practice and remedies code.  All
references herein are to that code unless specified otherwise.  





[4]Because Chesser contends
that this testimony is conclusory on its face, no objection at trial was
required.  See Coastal Transp. Co. v. Crown Cent. Petroleum Corp.,
136 S.W.3d 227, 233 (Tex. 2004).





[5] The supreme court in Coastal
explained:

[A]lthough expert opinion testimony often provides
valuable evidence in a case, “it is the basis of the witness’s opinion, and not
the witness’s qualifications or his bare opinions alone, that can settle an
issue as a matter of law;  a claim will not stand or fall on the mere ipse
dixit of a credentialed witness.”  Burrow v. Arce, 997 S.W.2d 229,
235 (Tex. 1999).  Opinion testimony that is conclusory or speculative is not
relevant evidence, because it does not tend to make the existence of a material
fact “more probable or less probable.”  See Tex. R. Evid. 401.

136 S.W.3d
at 232.





[6]At another point in his
testimony, Dr. Koch specifically testified that an ordinary prudent physician
not informed by nurses of the level of pain reported by Chesser related to the
insertion of the PEG tube on November 16, 17, or 18 would not be able to figure
out what problem Chesser was experiencing.  





[7]Despite Appellees’ request
that the negligence and percentage of responsibility of the settling doctors be
submitted to the jury, Appellees’ theory of the case was that the settling
doctors were not negligent.  During closing argument, Appellees’ counsel
explained, “Now, did we bring you evidence that Dr. Adedokun or Dr. DeLange or
Dr. Ferree were negligent?  No, we didn’t, because we don’t believe they
were.”  





[8] Chesser specifically does
not seek a remand on this issue.





[9]The parties did not
dispute in the trial court and do not challenge on appeal the correctness of
this settlement credit amount as a 10% reduction of the amount of damages to be
recovered by Chesser.





[10]Chesser contends that
Appellees are entitled to no settlement credit at all based on McAllen
Kentucky Fried Chicken No. 1, Inc., v. Leal, 627 S.W.2d 480, 485 (Tex.
App.––Corpus Christi 1981, writ ref’d n.r.e.).  Leal, however,
interpreted former Texas Revised Civil Statute article 2212a, which was
repealed in 1985; Leal is not applicable to our construction of section
33.012.  





[11]The final judgment signed
by the trial court includes as attachments various charts and computations in
essence “showing the math” of how the trial court arrived at the numbers it
did.  These attachments enable us to calculate exactly the change in the
judgment wrought by application of a dollar-for-dollar settlement credit
instead of a percentage settlement credit.  We do so in our judgment.





[12]The governing board
orientation policy listed the following as the governing board’s role in
facility finance:

a.  Hires and defines the total compensation level of the
Administrators.  The latter directs the daily operation of the facility and
manages its financial matters to achieve its stated mission.

b.  Develops a sound understanding of the sources of
the facility’s revenue and expenses and its economic environment.

c.  Approves financial goals that are designed to
ensure the long-term financial viability of the facility and the basis upon
which achievement of these goals can be measured.

d.  Approves short and long range financial policies
that are consistent with and will enable the facility to achieve its financial
goals.

e.  Establishes a code of conduct for board members and
management and monitors compliance with this code.

f.  Approves short and long-term operating, cash, and
capital budgets that are consistent with the facility’s overall financial
goals.

g.  Assists in planning and provides support for
philanthropic activities as desired.

h.  Approves methods of financing major capital asset
renovations, replacements, and additions.

i.  Reviews financial reports and operating statistics
on a regular basis to ensure that the facility takes appropriate action in
response to operating trends to achieve its financial goals.

j.  Works with the facility’s external auditors and
evaluates information from the internal and external auditors about the status
of financial controls and compliance with government regulations.

k.  Evaluates and approves financial plans for new
business ventures, programs and services and establishes criteria to measure
their ongoing viability.

 





[13]Having determined that
legally insufficient evidence exists to show a community of pecuniary interest
in the common purpose of the enterprise between Hospital and LMS, we need not
address Appellees’ factual sufficiency challenge to this element of joint
enterprise or Appellees’ contention, also asserted in their fourth issue, that
the evidence is also legally and factually insufficient to establish the fourth
element of a joint enterprise––an equal right to a voice in the direction of
the enterprise, which gives an equal right of control.  See Tex. R. App.
P. 47.1 (requiring appellate court to address only issues necessary to final
disposition of the appeal).  





[14]Question 1 asked:

Did the negligence, if any, of those named below,
proximately cause the injuries in question?

Answer “Yes” or “No” for each of the following:

LifeCare
Hospitals of North Texas, L.P.

d/b/a
LifeCare Hospitals of Fort Worth:         _______

 

LifeCare
Management Services, L.L.C.:        _______

 

In
answering Question No. 1, do not consider or otherwise attribute any act or
omission of any physician to LifeCare Hospitals of North Texas, L.P. d/b/a
LifeCare Hospitals of Fort Worth or LifeCare Management Services, L.L.C.   

 

The
jury answered “yes” as to both entities.  

 





[15]Appellees do not
challenge the legal or factual sufficiency of the evidence to support the jury’s
“yes” finding as to the negligence of Hospital.  Consequently, this
unchallenged jury finding is binding on appeal.  See Solares v. Solares,
232 S.W.3d 873, 880 (Tex. App.––Dallas 2007, no pet.); Reliance Ins. Co. v.
Denton Cent. Appraisal Dist., 999 S.W.2d 626, 629 (Tex. App.––Fort Worth
1999, no pet.). 

Appellees do not brief a sufficiency challenge to any
other element of negligence––only proximate cause.  See Appellees’ brief
of cross-appellants, p. 14.  Appellees state in their brief,

Although the jury heard expert opinion
regarding alleged breach of the standard of care by LMS (of which
Cross-Appellants do not concede), the jury heard from no medical or
administrative expert that any of these alleged breaches of the standards of
care by LMS, in reasonable medical probability, proximately caused Mr.
Chesser’s injuries.





[16]The governing board
orientation policy introduced as Chesser’s exhibit 64A explains that “1) The
composition of the Governing Board represents corporate leadership by LifeCare
Management Services [LMS],” that “2) The Governing Board is responsible for the
overall operation of the hospital, the protection of its assets, and the
outcomes of all services provided to its patients,” and that “3) This
responsibility is both a moral and legal obligation.”  [Emphasis
added.]   





[17]Higgenbotham testified:

[I]n this particular case, there is
knowledge of what the risks are with this procedure.  We have somebody who’s
being consciously sedated by a person who doesn’t have the qualifications to do
it.  They haven’t been trained.  We have nurse who are inserting knives and
sharp instruments into a patient’s abdomen, who likewise don’t have the
qualifications or credentials to do it.  And then there is open awareness, by
their own documentation on the transdisciplinary team conference, of what the
risks are.  And they do no care planning, and they continue to do the procedure
anyway.





[18]Chesser also suffered
from depression, anxiety, debilitation, and short- term memory loss; Dr. Koch
testified, “[T]hese patients require, and he does specifically, somebody kind
of being there all the time.  He’s like a - -he’s like a toddler in a big
adult’s body.”  





[19]Nurse Smith agreed that
at any time during Chesser’s stay at Hospital, she could have checked Chesser’s
PEG tube bolster and loosened it.  





[20]Chesser’s exhibit
67A—LMS’s and Hospital’s “Standards for Acute and Critical Care Nursing
Practice”—provides in part that “THE NURSE CARING FOR ACUTE AND CRITICALLY ILL
PATIENTS DEVELOPS A PLAN OF CARE THAT PRESCRIBES INTERVENTIONS TO ATTAIN
EXPECTED OUTCOMES.” [Emphasis in original.] The policy explains that the plan
is individualized to reflect the patient’s characteristics and needs, is
developed collaboratively with the team, reflects current acute and critical
care nursing practice, provides for continuity of care, establishes priorities
for care, and is “documented to promote continuity of care.” [Emphasis
added.]





[21]Nurse Smith testified
that there were several care plans in Chesser’s medical records generated by a
physical therapist, a dietician, and an occupational therapist, but she agreed
that Chesser’s medical records contain no care plan for the nursing department
after Chesser’s admission on November 12, 2004.  She agreed that her job
description required her to “[d]evelop a care plan that prescribes intervention
to attain expected outcomes.”   





[22]For example, in Chesser’s
medical records for November 20, 2004, one page shows that he reported his pain
as a 10 at 12:30 p.m., another page shows that he reported his pain as a 1 at
12:10 p.m., and yet another page shows that he reported his pain as a 4 at
12:30 p.m.    





[23]Moore also conceded that
Chesser’s medical records documented that he received physical therapy and
safety awareness on November 22 when in fact Chesser was transferred to Harris
Hospital on the evening of November 20.





[24]We have addressed
Chesser’s three primary theories of negligence by LMS, and the evidence is
legally sufficient to support the jury’s proximate cause finding concerning all
three theories of negligence.  We note, however, that we are required to affirm
the judgment on the jury’s verdict on this issue if the evidence is legally
sufficient concerning any one of these theories of negligence that LMS
proximately caused Chesser’s injuries.  Accord Dillard v. Tex. Elec.
Coop., 157 S.W.3d 429, 434 (Tex. 2005) (explaining that jurors could
unanimously find negligence even if they based their finding on different
negligent acts); Wackenhut Corr. Corp. v. de la Rosa, 305 S.W.3d 594,
622 (Tex. App.––Corpus Christi 2009, no pet.) (explaining that evidence is
sufficient to support yes answer to broad-form negligence submission if any of
the alleged negligent acts is supported by sufficient evidence).





[25]The jury was also
instructed that there can be more than one proximate cause of an event, and the
jury found more than one proximate cause because they also found Hospital’s
negligence proximately caused Chesser’s injuries. 

 





[26]Recall that negligence as
to LMS was defined as the 

failure to use ordinary care, that is,
failing to do that which a long-term acute care hospital management company of
ordinary prudence would have done under the same or similar circumstances or
doing that which a long-term acute care hospital management company of ordinary
prudence would not have done under the same or similar circumstances.  





[27]Appellees contend that
“Mr. Chesser is entitled to recover prejudgment interest on past damages,
pursuant to section 304.102 and 304.1045 of the Texas Finance Code.  However,
prejudgment interest on the award of past noneconomic damages should be
included within the $250,000 cap contained in section 74.301 of the Civil
Practice & Remedies Code.”  





[28]Our discussion and
analysis is limited in applicability to only cases, like this one, in which the
total noneconomic damages awarded by the jury were in excess of both of the
$250,000 caps and in excess of the $500,000 combined total of both applicable
caps; the jury here awarded $1,725,000 in noneconomic damages.





[29]Chesser argues that
because a jointly and severally liable defendant possesses a right of
contribution, the statutory provisions at issue do not conflict.  A right of
contribution, however, presupposes that the defendant has actually paid the
damages––that is, has already been civilly liable––for noneconomic damages in
excess of the $250,000 cap applicable to that defendant, in violation of the
express language of section 74.301(b).  See Tex. Civ. Prac. & Rem.
Code Ann. § 33.015(a), (b) (West 2008) (recognizing in both subsections a right
of contribution when a defendant has paid a percentage of damages greater than
his percentage of responsibility).





[30]Appellees concede that
Hospital remains jointly and severally liable for the entire judgment,
excluding the $250,000 noneconomic damages attributable to LMS pursuant to
section 74.301(a).  





[31]At the hearing held on
Appellees’ motion requesting periodic payment of future damages, Appellees’
counsel argued,

[Appellees’ counsel]:  There is also
74.505(c) that the periodic payment money must be returned to the defendants. 
I think the judgment has to - - to provide for that upon the death of the
plaintiff.

THE COURT:  Where are you - -

[Appellees’ counsel]:  I’m - - I’m citing section - -

THE COURT:  No. I understand.  I’m just wondering
where - -

[Appellees’ counsel]:  Somewhere in the
judgment I think there needs to be a provision there that provides for that.

[Chesser’s counsel]:  74. - -

[Appellees’ counsel]: –505(c).